## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | **Case No. 13-00925-TLM** |
| **BENONE HALINGA and** ) | |
| **PETRONELA HALINGA** ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| _____ ) | |

### MEMORANDUM OF DECISION
_____

This matter comes before the Court on the Objection to Claim of Exemption, Doc. No. 41, filed August 30, 2013 by chapter 7 trustee Jeremy Gugino ("Trustee").[1] Pursuant to § 522(o), Trustee seeks to reduce the value of the homestead exemption claimed by debtors Benone and Petronela Halinga (collectively "Debtors" and, where required for clarity, "Benone" and "Petronela"). Following an evidentiary hearing on the matter on November 7, 2013, the matter was taken under advisement. The Court concludes the Objection will be overruled. This Decision constitutes the Court's findings and conclusions pursuant to Rules 7052 and 9014.

---

[1] Unless otherwise indicated, all chapter, section and other statutory references are to the Bankruptcy Code, Title 11, U.S.C. §§ 101–1532 (the "Code"), and all rule references are to the Federal Rules of Bankruptcy Procedure 1001–9037.

MEMORANDUM OF DECISION - 1

**FACTS**[2]

Benone immigrated to the United States from Romania in the early 1990s. After living for a while in San Francisco, California, he moved to Anchorage, Alaska, where he lived for about fifteen years. Benone met Petronela in Romania in 1998, and she married him and moved to Alaska in 2000. Benone and Petronela moved to Boise, Idaho, in 2006, seeking a warmer climate in which to raise their three daughters.

After Benone immigrated to the United States, he began saving his wages. In 2003 or 2004, he purchased land in Romania on which he built a gas station. According to Benone, he continued reinvesting the profits in the venture, adding a convenience store, carwash and restaurant/cafeteria. In about 2005, he sold a partial interest in the venture for approximately $150,000. In 2006, after Debtors moved to Boise, Benone sold his remaining interest for approximately €350,000, which was then roughly equivalent to $450,000.

In 2007, Benone invested $145,000 of the proceeds from the sale of the gas

---

[2] The Court's factual findings are based on the testimony and exhibits presented at the hearing. The Court carefully evaluated the credibility of the witnesses and the documentary evidence and the weight to be given to their testimony. In particular, the Court paid close attention to the phrasing of questions and answers in order to determine what testimony had actually been elicited.
  The parties presented evidence on a number of matters that the Court has determined are not only collateral but, ultimately, irrelevant to this Decision, and the Court declines to make findings on those matters.

MEMORANDUM OF DECISION - 2

station into the purchase of a Boise city liquor license. That license was purchased by Benone personally. In May 2007, Benone registered his Alaska corporation, Benone Enterprises, Inc. ("BEI"), to do business in Idaho. Within a few months, Benone's accountant recommended the liquor license be transferred to BEI to limit Benone's personal liability. Benone so did. Debtors testified that BEI leased the license to a separate and unaffiliated entity in order to generate income. They used the lease payment income from the BEI liquor license to pay their personal home mortgage. Benone also invested about $300,000 of the proceeds from the sale of the gas station in the stock market through an Ameriprise account administered by a broker-dealer.

Benone also wanted to open a restaurant, although he testified that he waited for the right time and location. In mid-2010, he placed an ad on Craigslist seeking a chef with restaurant management experience. In September 2010, he met with Leroy Mickey, a career restaurant manager, after Mickey contacted him about the ad. The parties agreed that, in return for helping launch the planned restaurant and manage it once it opened, Mickey would receive an annual salary of $36,000 and a ten percent interest in the venture and its profits.

Although the parties dispute the amount or quality of work that Mickey engaged in, it is undisputed that he helped Benone launch the restaurant business for BEI. Benone and Mickey located and leased a restaurant space in BEI's name.

MEMORANDUM OF DECISION - 3

BEI also leased the liquor license needed for this restaurant from the sublessor of the property. Time Out Sports Pub and Restaurant ("the Restaurant"), owned by BEI and run by Benone and Mickey, opened in June 2011. But the relationship between Benone and Mickey quickly soured. Although the parties again dispute the specific circumstances, Mickey's employment at the Restaurant ended in early July 2011. After that, Mickey applied for unemployment benefits. Although BEI, through Benone, contested the award, Mickey prevailed and was awarded the benefits.

Shortly after, on August 22, 2011, an attorney representing Mickey sent a demand letter to Benone and BEI, seeking unpaid wages and treble damages, as well as the ten percent interest promised to Mickey. Ex. 202. Benone testified that he received the demand letter, showed it to his new restaurant manager and, on that manager's advice, ignored it. Benone and Petronela both testified that Benone did not show the letter to Petronela.

On February 28, 2012, Mickey filed a lawsuit ("State Court Case") in the District Court of Idaho's Fourth Judicial District ("State Court") against Benone, Petronela, and BEI. Ex. 204. The complaint sought unpaid wages and Mickey's alleged interest in the Restaurant. Ex. 204. Levi Holloway of Allied Process Servers signed affidavits (and subsequently testified) that he had personally served the summons and complaint to Petronela on February 29, and that she had also

MEMORANDUM OF DECISION - 4

then accepted service for Benone and BEI. Ex. 214 at 5–10. He testified that he identified one of the Debtors' cars in the driveway, and that the woman who opened the door and accepted service responded affirmatively when he asked if she was Petronela Halinga.

A default judgment was entered in the State Court Case against Benone, Petronela and BEI on March 23, 2012. Ex. 209 ("Default Judgment"). The State Court served the Default Judgment on BEI, Benone and Petronela by sending it that day to Debtors' home address via first class mail. Debtors each testified that they never received the Default Judgment.

During the same time frame as the dispute with Mickey, the Restaurant began to have significant financial difficulties. Benone testified that, although the Restaurant did brisk business the first couple months, it began to lose between $10,000 and $15,000 per month after that. He stated that he used most of the funds from the Ameriprise account to support the Restaurant.

Eventually, in late 2011, Benone began contemplating selling BEI's liquor license to generate funds needed to continue supporting the Restaurant. Despite Petronela's objections that they could not afford to lose the income they derived from the lease of the license, Benone ultimately decided to sell the license. On January 24, 2012, BEI sold the liquor license to Boise Blue Dog, LLC, and submitted a Bill of Sale to the Idaho State Police's Alcohol Beverage Control

MEMORANDUM OF DECISION - 5

office. Ex. 203. For the sale, BEI received a cashier's check for $135,000 made out to Benone personally. Ex. 207. Debtors testified that they did not immediately cash or deposit the check, holding on to it until March 26, 2012, when Petronela finally deposited it.

Debtors both testified that they delayed depositing these funds because they could not agree on how to spend them. When Benone sold the license, he wanted to put the funds into the Restaurant. But Petronela balked when she learned that Benone had used virtually all of the funds in the Ameriprise account to keep the Restaurant afloat, and that the Restaurant continued to lose more than $10,000 each month. Petronela wanted to use the sale proceeds to pay down the mortgage on their residence thus, she thought, lowering their monthly mortgage payments. This was important to her because, by sale of the license, they had lost the income source they had dedicated to that purpose.

Debtors' dispute became so heated that Petronela threatened divorce. Eventually, Debtors agreed that Petronela would open a separate account for the license proceeds, but one that Benone could not access. Benone in fact testified that, if he would have had access to the account, he likely would have spent some or all of the funds in support the Restaurant despite Petronela's threat of divorce. On March 26, 2012, Petronela opened a new checking account at U.S. Bank and

deposited $134,900 in it.[3] *See* Ex. 208. U.S. Bank placed a hold on $130,000 of the funds, which would not become available until April 4. Ex. 206. On April 3, Petronela wrote a check to Debtors' mortgagee, Bank of America for $99,020.44 (the "Mortgage Payment"), which amount was approximately half of what was owed on Debtors' home mortgage. Ex. 207. Petronela testified that she thought the Mortgage Payment would consequently halve their monthly mortgage payments; she did not realize that this was not an automatic result of the prepayment, and that they would need to refinance to reduce their payments.[4] The Mortgage Payment check was presented to U.S. Bank for payment from Petronela's account on April 9, 2012.

On April 12, 2012, Petronela attempted to use a debit card linked to a Wells Fargo account to pay for services at a dentist's office, and found out that nothing remained in that account. It had been garnished by Mickey, who was collecting on his Default Judgment. Later that day, Petronela found out that all of Debtors' collective Wells Fargo accounts had been emptied. She withdrew $5,000 in cash from the U.S. Bank account, and had the bank prepare a $30,800 cashier's check on that account; she testified that this was a gut reaction to protect their remaining money. Debtors testified that they found out about the Default Judgment the next

---

[3] Petronela testified she used the remaining $100 to open a savings account at U.S. Bank.

[4] Debtors testified they later learned they are ineligible to refinance until June 2014.

MEMORANDUM OF DECISION - 7

day when they were trying to figure out why their Wells Fargo accounts had been emptied. They testified that they had no knowledge of Mickey's case against them prior to this garnishment, and went to the courthouse the next day to find the documents regarding the State Court Case.

Later that month, Debtors contributed $5,000 to IRAs in each of their names, for a total of $10,000. Ex. 210 at 2. They also contributed $5,000 to a § 529 saving plan for each of their three daughters, for a total of $15,000. Ex. 210 at 1–2. Petronela testified, however, that Debtors later cashed out their daughters' § 529 accounts to pay household expenses.

Debtors attempted to have the Default Judgment set aside in April 2012, arguing that Petronela had not actually been served the summons and complaint. The State Court declined to set aside the Default Judgment against Debtors, finding that Petronela had been served and properly accepted service for Benone. But the State Court vacated the default against BEI because Petronela was not a proper person to accept service for BEI. The Idaho State Court of Appeals affirmed the State Court's decision on March 5, 2013. Ex. 211.

Benone closed the Restaurant in April 2012. He testified that not all of BEI's creditors were paid after the Restaurant closed.

Debtors filed their voluntary chapter 7 petition on May 9, 2013, just over two months after the Court of Appeals affirmed the State Court's decision. They

MEMORANDUM OF DECISION - 8

claimed their residence exempt under Idaho's homestead exemption statutes. Doc. No. 1 at 15.[5]

**DISCUSSION AND DISPOSITION**

A bankruptcy estate is created when the petition is filed. Under § 541(a)(1), the property of the estate consists of all legal and equitable interests in property held by the debtor at that time. *Rousey v. Jacoway,* 544 U.S. 320, 325 (2005). The Bankruptcy Code allows a debtor to exempt property of the estate under applicable law. *See* § 522(d). Because Idaho has "opted out" of the federal exemptions, Idaho debtors may claim only those exemptions authorized under Idaho law. *See* § 522(b); Idaho Code § 11–609.

In Idaho, exemptions are liberally construed in favor of the debtor. *In re Moore*, 349 B.R. 44, 46 (Bankr. D. Idaho 2005) (citation omitted). The objecting party bears the burden of proving the claim of exemption is not proper. *Id.* (citing Rule 4003(c)). Once that party presents "sufficient evidence to rebut the prima facie validity of the exemption, the burden shifts to a debtor to demonstrate that the exemption is proper." *In re Preuit*, 2013 WL 2467976, at *8 (Bankr. D. Idaho June 7, 2013) (citation omitted) (internal quotation marks omitted).

Under Ninth Circuit case law, some pre-bankruptcy exemption planning is

---

[5] Debtors also moved to avoid under § 522(f) Mickey's judicial lien on the property (which has been assigned to Eagle Judgment Recovery LLC), *see* Doc. Nos. 20, 25, but that issue is not ripe for decision at this time.

MEMORANDUM OF DECISION - 9

allowed. But even though not per se fraudulent, pre-bankruptcy transfers of nonexempt assets into exempt assets are also not per se proper. *Wolkowitz v. Beverly (In re Beverly),* 374 B.R. 221, 244–45 (9th Cir. BAP 2007), *aff'd* 551 F.3d 1092 (9th Cir. 2008). The Panel stated in that case:

> We publish to dispel the myth that the toleration of bankruptcy planning for some purposes insulates such planning from all adverse consequences—it does not. In matters of bankruptcy and insolvency planning, supposed safe harbors from one danger are exposed to dangers from other quarters and may, in any event, be too small to shelter large capital transactions.

*Id.* at 226; *see also Preuit*, 2013 WL 2467976, at *7 (citing *Gugino v. Orlando (In re Ganier)*, 403 B.R. 79, 84–85 (Bankr. D. Idaho 2009)).

Among the ways the Bankruptcy Code limits pre-bankruptcy exemption planning is § 522(o), a provision added in 2005. It provides for reduction of a state law homestead exemption to the extent of any value attributable to nonexempt property disposed of by the debtor within ten years of filing with intent to hinder, delay or defraud a creditor. *See* § 522(o).[6]

---

[6] In full, § 522(o) says:
> For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in--
> - **(1)** real or personal property that the debtor or a dependent of the debtor uses as a residence;
> - **(2)** a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence;
> - **(3)** a burial plot for the debtor or a dependent of the debtor; or
> - **(4)** real or personal property that the debtor or a dependent of the debtor claims as a homestead;
>
> shall be reduced to the extent that such value is attributable to any portion of any
> (continued...)

MEMORANDUM OF DECISION - 10

To prevail under § 522(o), the Trustee must establish: (1) the value of the debtor's homestead exemption increased; (2) the increase can be attributed to debtor's disposition of nonexempt assets; (3) the debtor disposed of the nonexempt assets with the intent to hinder, delay, or defraud a creditor; and (4) the debtor disposed of the nonexempt property no more than ten years before the bankruptcy petition was filed. *In re Stanton*, 457 B.R. 80, 91 (Bankr. D. Nev. 2011).

Here, Debtors concede the first, second and fourth elements are met. Doc. No. 60 at 5. In essence, Debtors agree their homestead exemption increased by the amount of the $99,020.44 Mortgage Payment, which was made only because Debtors sold BEI's liquor license, a nonexempt asset, a little more than a year before filing their bankruptcy petition.[7] Debtors only contest Trustee's assertions that they intended to hinder, delay or defraud their creditors.

The Bankruptcy Code does not define the phrase "with the intent to hinder, delay, or defraud a creditor," but the phrase is used elsewhere in the Code. *See* § 548(a)(1) (allowing a trustee to avoid a transfer made within two years before the

---

[6] (...continued)
property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

[7] For all intents and purposes the parties treated the liquor license proceeds as though they were Debtors' personal property. Neither party addressed the impact, if any, of Debtors' appropriation of the liquor license proceeds from BEI on the matters at issue in this Decision. The Court will similarly disregard that nuance, as it ultimately has no bearing on the outcome in this case.

MEMORANDUM OF DECISION - 11

petition date "with actual intent to hinder, delay or defraud" a past or future creditor); *see also* § 727(a)(2) (denying discharge to a debtor who transfers or conceals property "with intent to hinder, delay, or defraud a creditor" within one year before the petition date). Because Congress chose to use the same phrasing as other Code sections, courts have looked to those sections when interpreting § 522(o). *See, e.g., In re Craig*, 2012 WL 6645692, at *3 (Bankr. D. Mont. Dec. 20, 2012); *Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x 301, 306 (5th Cir. 2012); *Addison v. Seaver (In re Addison),* 540 F.3d 805, 811 (8th Cir. 2008).

Section 727(a)(2) requires actual, not constructive, intent despite the fact that the language of that section does not include the word "actual" (unlike § 548(a)(1)). *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985) (citing *In re Adlman*, 541 F.2d 999, 1003 (2d Cir. 1976)). Thus, § 522(o) also requires actual intent. *See, e.g., Craig*, 2012 WL 6645692, at *3.[8]

A plain reading of the statutory language reveals that "hinder, delay, or defraud" is stated in the disjunctive, so intent to hinder or delay is sufficient. *See* § 522(o); *see also Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th

---

[8] *Adlman* reasoned that actual intent to hinder, delay or defraud was required to deny a debtor's discharge because of the Code's underlying purpose of preserving a fresh start for honest debtors. *Adlman*, 541 F.2d at 1003. Exemption laws are similarly favorably construed for a debtor for the same reasons. *See, e.g., In re Hall*, 464 B.R. 896, 906 (Bankr. D. Idaho 2012) ("[T]he Court is mindful that Congress drafted the Code to include exemptions in order to facilitate a debtor's fresh start, and that Debtors ought to be able to make full use of those available exemptions.") Thus this Court concurs in determining that § 522(o) requires actual, rather than constructive intent.

MEMORANDUM OF DECISION - 12

Cir. 1996) (discussing § 727(a)(2)). Additionally, courts may infer the requisite intent from all the facts and circumstances of a case, because a debtor is unlikely to testify directly that his intent was fraudulent. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986); *Devers*, 759 F.2d at 754.

The so-called "badges of fraud" may be instructive when analyzing the requisite intent. *Craig,* 2012 WL 6645692, at *4–5. Courts may use badges of fraud not only to show the intent to defraud, but also to show the intent to hinder or the intent to delay. *Stanton*, 457 B.R. at 93. These badges include:

> 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

*Retz v. Samson (In re Retz),* 606 F.3d 1189, 1200 (9th Cir. 2010) (citing *Emmett Valley Assocs. v. Woodfield (In re Woodfield),* 978 F.2d 516, 518 (9th Cir. 1992)).[9] As the bankruptcy court articulated in *Stanton*, "Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all. As *Collier* states:

---

[9] Trustee cited, as have some courts, the badges of fraud as articulated in the Uniform Fraudulent Transfer Act. *See, e.g., Stanton*, 457 B.R. at 93. That articulation does not differ significantly from the discussions of the Ninth Circuit, generally expounding on the traditional factors.

MEMORANDUM OF DECISION - 13

'Whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient.'" *Stanton*, 457 B.R. at 94 (quoting 5 Collier on Bankruptcy ¶ 548.04[1][b][ii] (16th ed., Alan N. Resnick and Henry J. Sommer, eds.)).

Here, Trustee argues the circumstances surrounding the Mortgage Payment establish several of the badges of fraud. Indeed, Debtors did not dispute that they were in dire financial condition when they made the Mortgage Payment, that the liquor license was their largest or most significant nonexempt asset,[10] or that they ultimately stand to benefit from that transfer, which changed nonexempt property into exempt property. But they argue that those circumstances were coincidental and had other explanations.

Obviously much of the testimony focused on the timing of the April 4, 2012 Mortgage Payment in relation to the February 28 filing of Mickey's lawsuit and the March 23 mail service of the Default Judgment.

Debtors testified that they were never served with the State Court complaint. Trustee presented Holloway's testimony to the contrary. Ultimately, this Court finds, as did the State Court, that Debtors were served with the summons and complaint in the State Court Case, and so had notice of the pendency of that case. Debtors never effectively impeached Holloway's testimony that

---

[10] *See* note 7, *supra*.

MEMORANDUM OF DECISION - 14

Petronela opened the door and identified herself, or that he later verified her identity from her picture after she disputed she had been served.[11]

Trustee also argues that the timing of Petronela depositing the cashier's check and opening a new account, only three days after the Default Judgment was mailed, indicates Debtors' intent to hinder, delay or defraud Mickey.[12] But that argument presumes Debtors knew about the entry of the Default Judgment. Under the mailbox rule, a document is deemed received "in the ordinary course of the mails" upon proof that it was properly sent, *Herndon v. De la Cruz (In re De la Cruz)*, 176 B.R. 19, 22 (9th Cir. BAP 1994) (citing *Hagner v. United States*, 285 U.S. 427, 430 (1932)),[13] but nothing in that rule establishes the timing of the "ordinary course of the mails." Trustee presented no evidence to establish when Debtors received the Default Judgment and, indeed, conceded as much in his

---

[11] Debtors attempted to impeach Holloway's testimony by arguing he testified he had Petronela's picture when he served the State Court summons and complaint, contrary to the affidavits of service he submitted in the State Court Case. However, the questions posed by Debtors' counsel did not clarify whether counsel was asking about Holloway's initial service of the State Court summons and complaint or Holloway's August 2012 service of an order granting Trustee's motion for a Rule 2004 exam. Because Debtors' counsel's questions were unclear, Holloway's testimony was similarly unclear and not necessarily inconsistent with his earlier affidavits.

[12] The Mortgage Payment check was written on April 3, just before U.S. Bank lifted the hold on Petronela's deposit of the cashier's check. Thus, Trustee argues the Mortgage Payment was made as soon as possible after Debtors learned of the entry of the Default Judgment.

[13] Bankruptcy courts and Idaho state courts both apply the mailbox rule. *De la Cruz*, 176 B.R. at 22; *Airstream, Inc. v. CIT Fin. Servs., Inc.*, 723 P.2d 851, 856 (Idaho 1986). The only way to rebut the presumption of receipt is to provide evidence beyond the mere testimony of the presumed recipient that he did not receive the mailing. *De la Cruz*, 176 B.R. at 22.

MEMORANDUM OF DECISION - 15

closing argument. Trustee suggested the Court make an evidentiary presumption from Rule 9006(f), which grants an additional three days to certain time periods where service is made by mail. But Trustee did not cite—and the Court is unaware of—any authority under which the Court can divine evidence of the actual receipt of mail from this Bankruptcy Rule. Trustee also repeatedly mentioned receipt would have occurred in "the ordinary course of business," but again provided no evidence establishing what should be considered in the ordinary course of business.[14] Thus, the Court cannot determine *when* Debtors received the Default Judgment. Petronela's deposit of the cashier's check from the sale of the liquor license, three days after the State Court mailed the Default Judgment, could be coincidence, particularly given Debtors' credible testimony about the reasons for the delay.[15]

However, even if Trustee had established that Debtors received the Default Judgment before making the Mortgage Payment, the Court would still on this record conclude Debtors did not have the requisite intent. Trustee presented no evidence that Debtors knew about or understood the effect of the Idaho homestead

---

[14] During closing arguments, the Court and Trustee engaged in a colloquy discussing this issue. Trustee did not specifically request the Court take judicial notice under Federal Rule of Evidence 201. To the extent Trustee intended his remarks as a request for judicial notice, his attempt was ineffective.

[15] Benone's testimony was particularly persuasive in that he admitted unflattering facts about himself, including that he would have put the proceeds of the liquor license into the Restaurant even at the cost of his marriage.

MEMORANDUM OF DECISION - 16

exemption statutes.[16] Trustee presented no evidence that Debtors had been advised of the existence or extent of a homestead exemption by an attorney or anyone else. *Cf. In re Lacounte*, 342 B.R. 809, 815–16 (Bankr. D. Mont. 2005) (determining § 522(o) applied when debtors sold assets to insiders after seeking the advice of bankruptcy counsel).[17]

Nor can the Court infer that Debtors had knowledge of the effect of exemptions from their background. While Debtors each owned a business, their testimony revealed them to be less than sophisticated in their financial dealings. In particular, Petronela's testimony that she assumed the Mortgage Payment would cut their future home payments in half was credible and not impeached. That testimony did not support Trustee's presumption that she had the sophistication necessary to defraud creditors by implementing an exemption-planning scheme. Additionally, Debtors' testimony revealed that they struggled with some English

---

[16] Although Debtors never testified about any understanding or knowledge of exemptions, Trustee did elicit testimony from Debtors that they understood the effect of having a judgment against them, including that their bank accounts and wages could be garnished to satisfy a judgment.

While Trustee argued that knowledge of the possibility of garnishment explained why Petronela opened a separate bank account at U.S. Bank rather than deposit the funds into one of Debtors' existing accounts at Wells Fargo, that explanation does not accord with Petronela's testimony that she opened a new account at a new bank so Benone would not have access to the funds. Further, Debtors did not transfer the funds out of their existing Wells Fargo accounts when Petronela opened the U.S. Bank account, which they would have done had they known those accounts were about to be garnished.

[17] Similarly, Trustee presented evidence that Debtors placed funds in the IRAs and § 529 plans, but he did not elicit testimony that Debtors knew that those accounts were exempt. Further, Trustee's objection under § 522(o) does not put the IRAs and § 529 plans directly at issue.

MEMORANDUM OF DECISION - 17

words and phrases, particularly those dealing with financial concepts, further indicating their lack of familiarity with those concepts.

Trustee argued that the Mortgage Payment was suspect because Idaho's homestead exemption is capped at $100,000, *see* Idaho Code § 55-1003, implying that Debtors knew about both the homestead exemption and the cap on it. But Petronela testified that the amount she paid was simply half of the outstanding balance of their home loan.

Determination of Debtors' intent is a close call in this case, given that the transaction suggested several of the badges of fraud. But the burden was on Trustee to establish Debtors' intent with a preponderance of the evidence. Given the lack of evidence about Debtors' knowledge of exemption law, and Debtors' reasonable explanation for the Mortgage Payment despite the suspect circumstances, the Court concludes the burden was not met.

**CONCLUSION**

Trustee failed to establish the elements of § 522(o) as required by applicable authorities, and his Objection to Claim of Exemption will be denied. Debtors' counsel shall provide a form of order.

DATED: November 27, 2013



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 19